UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
:
UNITED STATES OF AMERICA,
:
                Plaintiff,
:     No. 10 Crim. 1205 (PAC)
:
      v.
:
LOUIS TOMASETTA and EUGENE HOVANEC,
:
                Defendants.
:
------------------------------------------------------------------ x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL

**BIRD, MARELLA, BOXER, WOLPERT,**
**NESSIM, DROOKS & LINCENBERG, P.C.**
Gary S. Lincenberg (admitted *pro hac vice*)
Peter J. Shakow (admitted *pro hac vice*)
1875 Century Park East, 23rd Floor
Los Angeles, California  90067
310.201.2100

**CLAYMAN & ROSENBERG**
Charles Clayman
Isabelle Kirshner
305 Madison Avenue
New York, New York  10165
212.922.1080

*Attorneys for Defendant Eugene Hovanec*

**MORRISON & FOERSTER LLP**
Dan Marmalefsky (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California  90013-1024
213.892.5200

Lawrence Gerschwer
Katie L. Viggiani
1290 Avenue of the Americas
New York, New York 10104-0050
212.468.8000

*Attorneys for Defendant Louis Tomasetta*

**I.      INTRODUCTION**

Defendants' 10-page Motion for Judgment of Acquittal focuses on a single, straightforward truth:  the Government's failure to present evidence proving beyond a reasonable doubt the existence of a single overarching conspiracy contemplating both revenue inflation and false accounting for stock options.  Yet it is not until page 20 of its Opposition that the Government first addresses whether it presented evidence sufficient to sustain a conviction for the charged single conspiracy.  Even then, the Government's argument is conclusory and without support in the trial record.

The Government contends that because the Court denied Defendants' motion for judgment of acquittal of the conspiracy count after the first trial, the Court must deny Defendants' current motion.  In so arguing, the Government ignores the fact that the evidence presented at the second trial was substantially more exculpatory than that presented at the first, most importantly in that the two key government cooperators conceded that they were not a part of and knew nothing about any single overarching conspiracy.  Indeed, Defendants specifically elicited that exculpatory testimony in response to the Court's prior ruling.  Defendants also debunked the Government's theory that the 2001 evergreen options were backdated.  The Court should decide this motion on its own merits, and based on the evidence (or lack thereof) presented at the second trial.

## II.     ARGUMENT

### A.     The Government Failed to Establish the Requisite Proof of Mutual Dependence and Assistance Between the Alleged Revenue and Stock Options Misconduct

The Government charged Defendants with participating in a single, overarching conspiracy to defraud investors by both (i) recognizing revenue in a manner that was inconsistent with Vitesse's disclosures, and (ii) falsely representing that Vitesse had no options granted to employees in which the market price of the stock exceeded the exercise price on the date of the grant.  To meet its burden, the Government had to prove, beyond a reasonable doubt, that Defendants agreed to perpetrate this *single* scheme.  Under the well-settled law of this Circuit, in order to prove a single as opposed to multiple conspiracies, the Government was required to provide "sufficient proof of mutual dependence and assistance" between the putatively separate spheres of operation.  *United States v. Berger*, 224 F.3d 107, 114-15 (2d Cir. 2000).  The Government acknowledges that it bears this burden, Opp. at 21, but it failed to meet it at the second trial.  It presented no evidence that the alleged revenue recognition scheme and the alleged options scheme were interrelated or mutually dependent, and therefore failed to prove they were a part of a single overarching conspiracy.

The revenue recognition scheme is alleged to have involved: (i) misrepresentations about how Vitesse recognized revenue on transactions with Nu Horizons; (ii) misapplication of credits for returned product; and (iii) misrepresentations regarding Vitesse's accounts receivable balances.  Mody and Kaplan testified to the interrelationship of these allegations.  Though not conceding these allegations, for purposes of this motion, Defendants do not contest that the Government presented evidence from which a juror could conclude that the Defendants used

3

revenue from the initial stocking package with Nu Horizons "as a disguise" so they could record previously unrecorded credits from prior periods (Opp. at 11); manipulated Vitesse's accounts receivable balances by failing to record product returns from Nu Horizons properly (Opp. at 14); and authorized credits and returns based in part on the size of the next quarter's stocking package with Nu Horizons (Opp. at 10). Nor do Defendants, for purposes of this motion, contest that those alleged practices were interdependent.

Those connections between different aspects of the alleged revenue recognition scheme, however, stand in stark contrast to the complete absence of evidence of any interdependence between the alleged revenue scheme and the option accounting allegations. The latter have no connection to Nu Horizons or any other customer. No witness testified, and no exhibit showed, that the options issue had any impact on the Company's decision-making regarding the reporting of its revenues. Testimony about the options allegations was offered by a few discrete witnesses (Currie, Keever, and the Munger Tolles attorneys, who spoke about the alleged cover-up, not the grants themselves).[1] None of these witnesses offered any testimony on revenue issues.

Though the burdens of proof and persuasion remain with the Government, defense counsel on cross-examination in the second trial elicited testimony that foreclosed the possibility of a reasonable juror concluding beyond a reasonable doubt that there existed a single overarching conspiracy. Both Yatin Mody and Nicole Kaplan denied any knowledge of or participation in any conspiracy to account for stock options improperly:

---

[1] The Government conveniently chose not to call any of the Board members with percipient knowledge of the grants in question.

<u>Testimony of Yatin Mody (RT 817: 20-22)</u>

Q. Sir, at any time that you were at Vitesse, did you intentionally account for evergreen options improperly?

A. No.

<u>Testimony of Nicole Kaplan (RT 1883:21 – 1884:5)</u>

Q. Now, just briefly, with regard to stock options, in 2001 were you, to your knowledge, a member of a conspiracy to improperly account for stock options?

A. To my knowledge, no.

Q. And at any time at Vitesse did you intentionally account for Evergreen options improperly?

A. No.

The Government had no choice but to accept these admissions from its star witnesses in its summation. (RT 2742:19 – 2743:1).

This evidence is critical for a number of reasons. First, the Government can no longer reasonably claim, as it did in its Opposition to Defendants' Motion for Judgment of Acquittal after the first trial, that Mody helped orchestrate both schemes. (*See* Dkt. No. 167 (filed 5/22/12) at 31.) Second, Mody and Kaplan were the primary actors in the alleged revenue recognition scheme. It was they who managed the line accounting staff (*see, e.g.,* RT 1026:15 – 21; 1554:3-23), oversaw the accounts receivable balances and reserves (*e.g.,* RT 977:20 – 978:12; 1041:2-9; 1539:24 – 1540:3; 1914:24 – 1915:6), directed misapplication of cash and credits (*e.g.,* RT 967:21 – 968:2), made decisions about what revenue to record immediately and which to defer (*e.g.,* RT 1005:11 – 1006:16; 1962:18 – 1963:2), and dealt with the auditors from KPMG (*e.g.,* RT 812:20 – 813:11; 855:16 – 856:1; 1909:15-23). Mody and Kaplan further acknowledged that they drafted and prepared the financial statements, including the very disclosures that form the basis of the operative Indictment. (*e.g.,* RT 854:24 – 855:12; 1026:22 – 1027:2; 1960:15-25).

Mody and Kaplan were without question the individuals primarily responsible for the accounting at Vitesse. Any accounting or financial reporting irregularity would, by virtue of their acknowledged roles and responsibilities at the Company, have had to go through them. Both acknowledged as much on the stand, and repeatedly admitted being integral to the alleged conspiracy to misrepresent Vitesse's revenues. That neither had any idea there was any plan or scheme to improperly account for stock options is irreconcilable with the claim that there was one overarching conspiracy.

Unable to cite to any testimony or exhibit evidencing the existence of a conspiratorial agreement contemplating both revenue inflation and false accounting for stock options, the Government states that both alleged misrepresentations contributed to a false impression of Vitesse's financial performance. (Opp. at 22.) A possible common purpose ascribed by the Government retrospectively, however, is not evidence of a contemporaneous overarching conspiratorial agreement. It is nothing but counsel's argument and cannot serve as the basis of a conspiracy conviction, particularly where the Government failed to proffer any evidence that Defendants actually agreed on such a common purpose.[2]

The evidence presented at trial failed to show that Defendants knowingly and intentionally made any misrepresentations about accounting for stock options in order to deceive investors about Vitesse's financial performance. The Government conceded in its Opposition

---

[2] Nor does this post-hoc rationale establish the required "mutual dependence and assistance" of and between the two, separate alleged schemes. For example, assume John Doe and Mary Smith conspired to sell fraudulent art to make money. Assume they also conspired to deal drugs to make money. Simply because both schemes have the same goal of making money does not mean they are part of a single overarching conspiracy. Likewise, here, just because the Government argues that a goal of both the revenue recognition and the option accounting schemes was to misrepresent the financial condition of the Company does not mean those alleged schemes were linked.

that "the various false statements *must be linked*…to the overall scheme to make the company's financial results look better than they actually were." (Opp. at 25) (emphasis added). By the Government's own terms, because the accounting for stock options was not in any manner linked to the decision-making regarding reporting of revenues and the timing of recording credits, there was no single, overarching conspiracy.

Moreover, based on the evidence adduced at the second trial, even when viewed in the light most favorable to the Government, no juror could find beyond a reasonable doubt that there was any conspiracy to account improperly for stock options at all, much less that such a conspiracy was assisted by and dependent upon the alleged revenue recognition scheme. In a case that hinged on whether certain meetings of Vitesse's Compensation Committee actually took place, the Government did not call a single member of that committee to testify. Witness after witness acknowledged that they did not attend *any* Vitesse Board meetings, and specifically that they did not attend any meetings of the Compensation Committee in April or October 2001. (*See, e.g.,* RT 212:6-20 [Pajjuri]; RT 427: 3-5 [Currie]; RT 2199: 11-16 [Keever]). Together with the documents admitted at trial, there can be no question the Government failed to meet its burden. The Government alleged, for example, that evergreen options dated October 2, 2001, were really granted at a Board meeting held on October 25, 2001. Yet it did not call a single witness who attended either meeting. Defendants, on the other hand:

- Introduced an entry from Vitesse Board member Jim Cole's calendar reflecting that he attended a Vitesse meeting on October 2, 2001 (Ex. 5403);

- Introduced an October 9, 2001 email from Karen Keever to Mody and others reflecting that "During the fiscal year '02 plan meeting last Friday [October 5, 2001], Lou announced that the board has decided to issue new stock option grants to all current optionees." (Ex. 488);

7

- Elicited testimony from Mody that, based on Keever's October 9, 2001 email, Tomasetta had indeed made such an announcement – within three days of the decision by the board. (RT 1176: 5-16.)

- Introduced a memo from Keever to all current optionees dated October 17, 2001, in which Keever discussed the October 2, 2001 grant. (Ex. 5412.)

- Elicited testimony from Yatin Mody that the Government's theory could not possibly be right (RT 1178: 2-6):

    > Q. Sir, is there any doubt in your mind that these stock options that are described in the October 25 minutes were granted before October 25?
    >
    > A. According to this memo [Ex. 5412], they were approved before October 25.

- Elicited testimony from Karen Keever that the Government's theory was wrong (RT 2198:23 – 2199:3):

    > Q. Do you agree with me that as of October 17, 2001, a decision had been made that all optionees, all eligible optionees were going to receive stock option grants with the grant date of October 2, 2001, and an option price of $7.27?
    >
    > A. I don't believe I would have sent this memo [Exh. 5142] if I didn't have that information.

This evidence, a significant amount of which was introduced for the first time at the second trial, deals a fatal blow to the Government's theory. It went unrebutted throughout the trial, summations, and except for the totally unsupported conclusory assertion that it was "obvious" that no Compensation Committee meetings had been held on the earlier dates (Opp. at 16), even in the Government's latest Opposition. The creation of meeting minutes in 2005 and 2006 in response to the Wall Street Journal inquiry does not substitute for the lack of any evidence of a single overarching conspiracy here.

The Government's failure to prove beyond a reasonable doubt that there was any conspiracy to account improperly for stock options thus underscores the complete absence of

evidence sufficient to establish the "single, overarching scheme" charged in the First Superseding Indictment.

**B.      Having Failed to Present Sufficient Evidence of a Single Overarching Conspiracy, the Government Does Not Get a Third Chance to Present Its Case**

Thirty-two jurors and alternates have now spent weeks of their lives over the course of two trials listening to witnesses, sifting through documents, hearing arguments and instructions, and debating amongst themselves the fates of these Defendants.  The jurors, these defendants, their families, and all of the witnesses in this case – including the two Government cooperators – have faced repeated and significant disruptions to their lives as a result of these trials, which relate back to Board meetings that took place more than twelve years ago.  Because the Government failed to present sufficient evidence of the charged conspiracy at the most recent trial, it should be denied a third opportunity to impose these burdens anew.

## III.      CONCLUSION

For all the reasons stated above, the Court should direct entry of a judgment of acquittal for both defendants.

| | |
|---|---|
| Dated: Los Angeles, CA<br>June 7, 2013 | MORRISON & FOERSTER LLP<br><br>Dan Marmalefsky<br>555 West Fifth Street<br>Los Angeles, California  90013-1024<br>213.892.5200<br><br>Lawrence Gerschwer<br>Katie L. Viggiani<br>1290 Avenue of the Americas<br>New York, New York 10104-0050<br>212.468.8000<br><br>By:   */s/ Dan Marmalefsky*<br>         Dan Marmalefsky<br>         *Attorneys for Defendant*<br>         *Louis Tomasetta* |
| Dated: Los Angeles, CA<br>June 7, 2013 | BIRD, MARELLA, BOXER, WOLPERT,<br>   NESSIM, DROOKS & LINCENBERG, P.C.<br><br>Gary S. Lincenberg<br>Peter J. Shakow<br>1875 Century Park East, 23rd Floor<br>Los Angeles, California  90067<br>310.201.2100<br><br>CLAYMAN & ROSENBERG<br>Charles Clayman<br>Isabelle Kirshner<br>305 Madison Avenue<br>New York, New York  10165<br>212.922.1080<br><br>By:   */s/ Peter J. Shakow*<br>         Peter J. Shakow<br>         *Attorneys for Defendant*<br>         *Eugene Hovanec* |