**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------x
                                           :

**UNITED STATES OF AMERICA,**       :

                          :

               **Plaintiff,**    :       **No. 10 Crim. 1205 (JSR)**

                          :       Date:  November 7, 2013

         **v.**                :       Time:  5:00 p.m.

                          :       Dept:  14B

**LOUIS TOMASETTA and EUGENE HOVANEC,**:

                          :

            **Defendants.**   :

                          :
--------------------------------------------------------------------------x


<u>**DEFENDANT EUGENE HOVANEC'S SENTENCING MEMORANDUM**</u>


**BIRD, MARELLA, BOXER, WOLPERT,**
**NESSIM, DROOKS & LINCENBERG, P.C.**
Gary S. Lincenberg (admitted *pro hac vice*)
Peter J. Shakow (admitted *pro hac vice*)
1875 Century Park East, 23rd Floor
Los Angeles, California  90067
310.201.2100

**CLAYMAN & ROSENBERG**
Charles Clayman
Isabelle Kirshner
305 Madison Avenue
New York, New York  10165
212.922.1080

*Attorneys for Defendant Eugene Hovanec*

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................. 1

II.    SUMMARY OF FACTS ...................................................................................... 2

       A.    Vitesse .................................................................................................. 2

       B.    A Wall Street Journal Article Leads to an Internal Investigation .................. 2

       C.    Effort to Impede the Investigation ............................................................ 3

III.   SUBSEQUENT LITIGATION HISTORY ......................................................... 4

       A.    The Parallel Civil Suits ......................................................................... 4

       B.    The Government Enforcement Cases ........................................................ 4

IV.    THE IMPACT OF THE SENTENCING REFORM ACT ........................................ 5

V.     THE IMPORTANCE OF THE PLEA AGREEMENT AND HISTORY OF
       THIS LITIGATION ............................................................................................ 7

VI.    HISTORY AND CHARACTERISTICS OF MR. HOVANEC ............................... 9

       A.    Background and Family Life ................................................................... 9

       B.    Working Life ....................................................................................... 12

VII.   OTHER SENTENCING CONSIDERATIONS ............................................... 15

       A.    Acceptance of Responsibility ................................................................ 15

       B.    Zero Chance of Repeating .................................................................... 15

             1.    Mr. Hovanec's Good Character ...................................................... 15

             2.    He Will Never Again Be an Officer or Director of a Public
                   Company ................................................................................... 15

       C.    Nature of the Offense Weighs in Favor of Mitigation ................................ 16

       D.    Financial Punishment .......................................................................... 16

VIII.  CONCLUSION ................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States v. Ameline,*
   400 F.3d 646 (9th Cir. 2005) ............................................................................ 6

*United States v. Bolds,*
   511 F.3d 568 (6th Cir. 2007) ............................................................................ 7

*United States v. Booker,*
   543 U.S. 220 (2005) .......................................................................................... 6

*United States v. Crosby,*
   397 F.3d 103 (2d Cir. 2005) ............................................................................. 6

*Gall v. United States,*
   552 U.S. 38 (2007) ............................................................................................ 7

*United States v. Jones,*
   460 F.3d 191 (2d Cir. 2006) ............................................................................. 7

*United States v. Preacely,*
   628 F.3d 72 (2d Cir. 2010) ............................................................................... 6

*United States v. Trujillo-Terrazas,*
   405 F.3d 814 (10th Cir. 2005) .......................................................................... 7

**Federal Statutes**

Federal Rules of Criminal Procedure Rule 11(c)(1)(B) ...................................... 8

18 U.S.C. § 371 ............................................................................................... 1, 6

18 U.S.C. §3553(a) ......................................................................................... 6, 7

18 U.S.C. § 3553(a)(1), ...................................................................................... 17

28 U.S.C. § 994(j) ................................................................................................ 1

U.S.S.G. § 5B1.3(e) ............................................................................................. 8

**Other Authorities**

Sentencing Reform Act. ................................................................................... 1, 6

United States Sent. Comm'n, *Report on the Continuing Impact of United States v. Booker on Federal Sentencing*, Pt. A at 3 (Feb. 2013)............................................................ 7

## I.      INTRODUCTION

Defendant Eugene Francis Hovanec comes before the Court for sentencing on one count of conspiring to obstruct a possible SEC investigation in violation of 18 U.S.C. § 371.  The Government, Defense, and Probation Office all recommend that Mr. Hovanec be sentenced to pay a fine.

Prior to the underlying investigation, Mr. Hovanec had never been a defendant in any legal proceeding of any sort.  He lived his life as a straight-shooter who paid his taxes, obeyed the drug laws, supported his family, church and community, and treated all people with respect.  This litigation and the resulting settlements have brought enormous personal and financial pain to Mr. Hovanec.  Seven years ago Mr. Hovanec lost his livelihood.  Ever since, his life has been consumed by lawyers and legal proceedings, including dealing with class actions, shareholder derivative suits, an SEC case, and a federal criminal prosecution.  He has paid over 90% of his net worth in settlements, forfeited stock, and legal fees.

Now, after two lengthy trials resulting in deadlocks and dismissals, the parties have finally overcome their differences and entered into resolutions of the criminal and SEC cases.  In the prior criminal proceeding, Mr. Hovanec prevailed on all but the conspiracy count, upon which the jury deadlocked twice.  As part of this case resolution, the remaining conspiracy count is also being dismissed, with Mr. Hovanec pleading guilty to a new charge of conspiracy to obstruct justice.  The parties jointly recommend a sentence of probation.  In the Sentencing Reform Act, Congress counseled as to the "general appropriateness of imposing a sentence other than imprisonment in cases where the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  28 U.S.C. § 994(j).  Here, a sentence of probation, negotiated after years of litigation, certainly fits within the vision of the Sentencing Reform Act. For the reasons set forth below, Mr. Hovanec asks the Court to follow the recommendation of the parties and sentence Mr. Hovanec to a term of probation.

Mr. Hovanec has also reached a settlement of the parallel SEC case in which he will be subject to a permanent injunction, face a ten-year officer/director bar, and be required to pay a $50,000 penalty.  As the Court is aware from the financial information set forth in the presentence report, Mr. Hovanec has vastly reduced financial resources and very little income.  The agreed upon sentencing guideline fine range is $3,000 to $30,000.  In light of the $50,000 penalty for the SEC proceeding, Mr. Hovanec requests that the Court not impose any further fine, give credit for the SEC fine, or impose a fine at the low end of the guideline range.

## II.     SUMMARY OF FACTS

### A.     Vitesse

Vitesse Semiconductor Corporation ("Vitesse" or the "Company") is a public company located in Camarillo, California, which manufactures and supplies high-performance integrated circuits to technology companies.  In April 2006, Louis Tomasetta was the Chief Executive Officer.  Yatin Mody was the Chief Financial Officer.  Mr. Hovanec was Executive Vice President.  His primary role was to interface with the Company's outside counsel and oversee relationships with some of its larger customers and distributors.

### B.     A Wall Street Journal Article Leads to an Internal Investigation

In November 2005, a reporter from the Wall Street Journal called CFO Mody. The reporter was researching an investigative article on stock option grant practices at hundreds of companies, including Vitesse.  As a result of the call, Mody spoke to Tomasetta, Hovanec, outside counsel, board members and others at Vitesse.  Mody and Hovanec searched for but could not find compensation committee minutes for option grants dated April 6, 2001 or October 2, 2001.  They found minutes memorializing those grants, but those minutes were from board meetings that took place on April 12, 2001 and October 25, 2001, respectively.  Tomasetta and Hovanec believed that these grants were

made at telephonic meetings on April 6 and October 2 and recorded in the minutes of those later, in-person meetings.

Mody advised outside counsel that minutes of these two telephonic meetings were missing and that he intended to draft the minutes anew.  In late 2005, Mody drafted the minutes.  The executives then provided the minutes to relevant Board members, who signed and returned them to the Company.  (Trial Testimony of Yatin Mody, April 9, 2012 TR at 1991-93; April 10, 2012 TR at 2079-2081; and April 11, 2012 TR at 2310-11.)[1]  Mody then provided the signed minutes to outside counsel.

Several months later, on March 18, 2006, the Wall Street Journal published an article questioning the option grant practices at a number of companies, including Vitesse.  This led Vitesse's Board to request that its audit committee retain an outside law firm to independently investigate the matter.  The audit committee hired the Los Angeles firm Munger, Tolles and Olson ("Munger") to do so.

### C.       Effort to Impede the Investigation

On April 11, 2006, Munger came to Vitesse to begin its internal investigation and image various computers.  Vitesse employees were unaccustomed to this disruption and recoiled at the brusque attitude of the attorneys.  At the time, Vitesse executives were focused on a confidential, major transaction – the purchase of an Intel division code-named Aptos – which would have been highly profitable for the Company.  Tomasetta, Mody and Hovanec were concerned that if the internal investigation did not conclude expeditiously, the Aptos deal might not close.  They reacted defensively.  They thought if they told Munger they had found the missing minutes it could short-circuit the investigation and save the Aptos deal.  So in the evening on Wednesday, April 12, 2006, they retyped minutes for the two 2001 compensation committee meetings into the

---

[1]    Letters in support of Mr. Hovanec are attached as Exhibit A; excerpts of trial transcripts referenced herein are attached as Exhibit B.

computer of Tomasetta's executive assistant; Tomasetta then reset the computer's clock to make it appear as if the minutes had been input years earlier.  Tomasetta and Hovanec were both traveling on business the remainder of that week.  Tomasetta met with Mody over the weekend to discuss what they had done.  They agreed it was wrong and should be corrected.  On Monday, April 17, 2006, Tomasetta told Munger what they had done. The three executives were terminated shortly thereafter.

## III.    SUBSEQUENT LITIGATION HISTORY

### A.    The Parallel Civil Suits

After the Company made public the investigation and terminations, a number of class action and derivative suits were filed in the Central District of California and in Ventura County Superior Court against Vitesse, its current and former officers and directors, and its outside auditor, KPMG.  These suits settled at an early stage.  As part of these settlements, Mr. Hovanec personally paid approximately $750,000 – $250,000 in cash and 458,014 shares of Vitesse valued at approximately $500,000.  In connection with the settlement, he also waived his right to indemnification and advancement of legal fees.

### B.    The Government Enforcement Cases

After years of investigation and then inactivity, in December 2010 the U.S. Attorney filed charges against four executives of Vitesse in the Southern District of New York.  Former CFO Mody and former Director of Accounting Nicole Kaplan pled guilty to securities fraud charges and entered into cooperation deals with the Government.  At the same time, the SEC filed charges against the Company, Tomasetta, Mody, Hovanec and Kaplan.  The SEC trial was stayed pending the conclusion of the criminal case.

The first criminal trial took place in March-April 2012.  It resulted in a deadlock on all five counts charged against Mr. Hovanec.  Post-trial, pursuant to Federal Rule of

Criminal Procedure 29, the Court dismissed four of the five counts.  The Government re-tried the remaining conspiracy count in January-February 2013.  Again the jury deadlocked, this time 6-6.

A third trial was scheduled for November 2013.  In July, the parties reached a settlement whereby the Government would dismiss the conspiracy count and recommend probation in exchange for the defendants agreeing to plead guilty to conspiracy to obstruct or hinder a contemplated SEC investigation, in violation of 18 U.S.C. § 371, based on conduct occurring on April 12, 2006 – conduct which neither Dr. Tomasetta nor Mr. Hovanec had ever denied.  On August 15, 2013, Messrs. Tomasetta and Hovanec pled guilty to this offense.  In September, Tomasetta and Hovanec entered into settlement agreements with the SEC.  Mr. Hovanec's agreement included a bar, suspension, injunction and a $50,000 penalty.

## IV.     THE IMPACT OF THE SENTENCING REFORM ACT

In 18 U.S.C. §3553(a), Congress identified factors which a Court should use in fashioning in an appropriate sentence.  The Sentencing Commission attempted to give numerical value to different factors, but in *United States v. Booker*, 543 U.S. 220, 245 (2005), the Supreme Court held that the Sentencing Guidelines calculations are no longer mandatory.  *Booker* and its progeny have made clear that district judges must "craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.'"  *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)).  Limitations on the factors the Court may consider in sentencing under the Guidelines – such as previously impermissible grounds for departure – "no longer constrain the court's discretion in fashioning a sentence within the statutory range."  *United States v. Ameline*, 400 F.3d 646, 657 (9th Cir. 2005).  Instead, district judges should determine sentences befitting a defendant's individual circumstances, *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005) (abrogated on other grounds), giving "consideration [to] the judge's own sense of what is fair and a just

sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

Moreover, a sentencing court "may not presume that the Guidelines range is reasonable," *Gall v. United States*, 552 U.S. 38, 50 (2007) (emphasis added), and cannot "require extraordinary circumstances to justify a sentence outside the Guidelines range." *United States v. Bolds*, 511 F.3d 568, 580-81 (6th Cir. 2007) (quotation omitted).  Rather, a sentencing court "must [instead] make an individualized assessment based on the facts presented …." *Bolds*, 511 F.3d at 580 (citing *Gall*).  Consequently, once the advisory guidelines sentence is determined, the Court must consider other relevant facts and circumstances.  In particular, pursuant to 18 U.S.C. § 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary." After *Booker*, the factors set forth in Section 3553(a) "have a new vitality in channeling the exercise of sentencing discretion." *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005).  Accordingly, district courts now have more discretion to tailor sentences to the individual circumstances of a case. *Trujillo-Terrazas*, 405 F.3d at 819.

Specifically, Section 3553(a) requires the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from future crimes of the defendant, and provide the defendant with needed medical care; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range recommended by the Guidelines; (5) any pertinent policy statement;  (6) the need to avoid unwarranted sentencing disparities among defendants; and (7) the need to provide restitution to any victims.

As a result of the increased sentencing discretion courts now enjoy, an increasing number of sentences are being imposed below the guidelines range, and at a significant magnitude of variance. *See* United States Sent. Comm'n, *Report on the Continuing*

*Impact of United States v. Booker on Federal Sentencing*, Pt. A at 3 (Feb. 2013) (finding that for fraud sentences "the influence of the guidelines appeared to have diminished over time in several measurable ways, including decreasing rates of sentences imposed within the sentencing guideline ranges, and increasing rates of non-government sponsored below range sentences (those below range sentences imposed at the judges' discretion and not in response to a government motion).").

## V.  THE IMPORTANCE OF THE PLEA AGREEMENT AND HISTORY OF THIS LITIGATION

Interestingly, none of the 3553(a) factors directly address how much deference a court should give to the history of the litigation and the agreement of the parties as to the appropriate result.  Here we have an extraordinary set of circumstances: (i) a district court has previously dismissed all but the conspiracy count in the underlying indictment; (ii) two juries have deadlocked after lengthy trials; and (iii) this U.S. Attorney's Office has agreed to a Rule 11(c)(1)(B) plea agreement where the Government recommends a sentence of straight probation.  Specifically, the plea agreement provides:

> "In light of the unique factual circumstances of this case, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the Government will recommend that the defendant be sentenced to a term of probation and will not recommend any of the special conditions of probation set forth in U.S.S.G. § 5B1.3(e) (the "Recommended Sentence")."

This plea agreement was negotiated after a dedication of enormous resources by both sides.  The Government investigated and prosecuted this case for seven years.  Its two main witnesses alone were interviewed more than 80 times.  Preparation for trial involved thousands of hours of document and transcript reviews, examination outlines and preparation sessions, cross-country flights, motions regarding their testimony and so forth by multiple prosecutors, case agents, paralegals, defense attorneys, defendants, witnesses, and others.  More than twenty depositions took place in the related SEC case.  Millions of pages of documents spanning more than a dozen years were produced, reviewed, and analyzed.  Each time a new trial date was set, it led to dozens of other

7

witness interviews, prep sessions, and related work.  All of this was occurring where everyone recognized (and most witnesses admitted) that they really were no longer recalling a lot of the conversations, emails and documents – some twelve years old – that were the topics of testimony.  The trial also involved a large expenditure of resources for the Court, its staff, and the jurors.  Despite all of this, by the summer of 2013, the parties still faced two more trials – a third criminal trial and an SEC trial.  All of this should be viewed against the background that even the underlying case involved a set of circumstances that usually has been dealt with solely through civil litigation.

The legal process has been extremely expensive for Mr. Hovanec, partly for reasons beyond his control.  Because his motions to transfer venue were denied, there was the additional expense of trying the case in New York.  That expense increased exponentially when the January 2012 trial date was continued on the day of trial due to late discovery, the March 2012 trial deadlocked, a Rule 29 motion was necessary to obtain a dismissal of most of the counts, and the re-trial resulted in a 6-6 deadlock on the one remaining count, leading to another Rule 29 motion.  The cost of preparing for out-of-state trials three times has been more than Mr. Hovanec could bear.  More than twelve years after the alleged options backdating, seven years after his termination from Vitesse and three years after indictment, defendant Eugene Hovanec has been physically, emotionally, and financially broken.

It is extremely rare that this U.S. Attorney's Office enters into an 11(c)(1)(B) agreement with a recommendation of straight probation.  Neither side entered into this agreement lightly.  These circumstances weigh in favor of the Court giving great deference to the agreement of the parties and the supporting recommendation of the United States Probation Office as set forth in its Presentence Investigation report.

## VI.     HISTORY AND CHARACTERISTICS OF MR. HOVANEC

### A.     Background and Family Life

The picture of Mr. Hovanec that emerges from those who know him best is that of a regular guy, down-to-earth, giving, charitable, and kind to others.  His focus is and has always been his family and his community, helping those in need and treating everyone with respect, no matter their station in life.  Mr. Hovanec was born in Carteret, New Jersey on December 7, 1951.  He grew up in a modest home crowded with nine people: his mother, father, three siblings, a grandmother, and two single uncles.  His father Francis worked as a janitor at the naval reserve center, and fixed sewing machines on the side.  His mother Ann Marie was a homemaker.  He has two older sisters, Barbara (now a retired elementary school secretary and school board member in Piscataway, New Jersey), Frances (now a retired teacher from the Woodbridge Township School District), and an older brother Donald, now deceased.  Mr. Hovanec is close to his sisters.  Barbara recalls Gene as unspoiled, always trying to be a good son and "doing the right thing."  He was an altar boy who would "gladly give up a seat in church to an elder person and would stand throughout the mass."  (Letter of Barbara Santoro.)  Fran will never forget how when her first husband left, Gene stepped in to provide needed emotional support and how throughout his life, Gene has never put himself first.  (Letter of Frances Hovanec Sabaliauskas.)

In July 1969, having just finished his junior year in high school, Gene Hovanec was planning to follow in his older brother's footsteps and enlist in the army.  News came, however, that his older brother has been killed in action in Viet Nam.  Under military policy, Donald's death meant that Gene would not be going to Viet Nam, and the family would be relying on him more and more.  Gene matured quickly.  He stepped in to assist his parents, oversaw the Coming Home procedures and acceptance of the casket, and made sure everything was handled appropriately.  (Letters from sisters Barbara and Frances, and brother-in-law Richard.)

Mr. Hovanec graduated from Carteret High School in 1970.  The death benefit from Donald's military service sent Gene to college.  For the next four years, he lived at home, worked part-time, and commuted to Pace College in Manhattan.  He graduated in 1973 with a degree in business.

In 1975, Mr. Hovanec married his wife Vicky.  They remain together 37 years later, blessed with a strong marriage.  The young couple established a home in Metuchen, New Jersey.  Gene continued to be a crutch for his mom, looking after her and taking her to church every Sunday.  Gene and Vicky had three daughters:  April (born in 1975), Jackie (born in 1979), and Kimberly (born in 1985).  They now have five grandchildren – April's children, Kayla (11), and Ava (8), and Jackie's children Payton (10), Conner (7), and Logan (4).

Several years ago, Vicky Hovanec began slurring her words and her hands began shaking.  She was diagnosed with Parkinson's disease.  There are five stages of Parkinson's in which individuals regress from mild to worse, ultimately needing full-time care.  Vicky is currently approaching the third stage.  Though on medication, for Vicky it has been a steadily degenerative process, and she is in much worse shape than even just a year ago.  She has trouble with basic daily functions.  Because of a lack of sensation in her hands, Gene helps Vicky put on her clothes, wash her hair, get up and sit down, cut her food, and do the other simple life functions that the rest of us all take for granted.  She recently started losing her balance.  She gets tired throughout the day and requires more rest.  At times, she has trouble breathing.  Unless other family is around, Mr. Hovanec stays close to her throughout the day.  (*See* Letters from Family and Physician.)

Vicky Hovanec writes that her husband now spends his days doing yard work, cleaning, grocery shopping, and helping her cope with her medical issues.  Friends and family observe that Gene is "kind and patient with her and continues to treat her in the same loving fashion we have always witnessed since we met them."  (Letter from Scott and Victoria Christie.)  Vicky reflects on their current position with a supportive

sentiment: "We have a good marriage and in our hearts we believe will get through this and move on with our lives as best as we can."  (Vicky Hovanec letter.)

The Hovanecs' three daughters – April, Jackie, and Kimberly – have written heartfelt letters to the Court describing a father who was never judgmental and always supportive. They describe their dad as being as selfless a grandfather as he was a father. April, Mr. Hovanec's oldest, gives insight into her father's character:  "My dad has taught me most of all to be giving.  He is the most giving person I know and would give the shirt off his own back to a complete stranger."  Middle daughter, Jackie, now a mother of three, describes how Gene interacts with her children: "Every Christmas he takes my children to the church to choose two or three families that are having hardships and adopts them.  They then go buy presents for the family so that they have a happy holiday in their time of need. This lesson is one of many that he has helped me instill in my children."  His youngest daughter Kimberly writes: "I have never met a single individual who is more honest, thoughtful, and selfless than my father, Eugene Hovanec." (Letters of April Tingle, Jacqueline Nekovar, and Kimberly Hovanec.)  His brother-in-law describes Mr. Hovanec as never trying to act like anything more than a regular guy whose life has focused on family and community.  (Letter of Sam Sabaliauskas.)

Former neighbors and long-time friends Scott and Victoria Christie confirm this same view of Mr. Hovanec.  Scott, a retired firefighter/paramedic, and Victoria, an emergency room nurse, describe their former neighbor as "extremely generous."  They recite examples where Mr. Hovanec dropped what he was doing to help find their missing dog and helped a less fortunate girl on a local softball team so she could afford to travel with her team.  They describe Gene as "the type of man that would selflessly give the shirt off his back" to those in need.  The Christies say Mr. Hovanec spent his weekends working around the house, washing cars, doing projects with his children, and going to church.  (Letters from the Christies.)  Another neighbor and long-time friend describes Mr. Hovanec the same way – offering memories of Gene being quick to lend

out his tools and help neighbors with household projects.  (Letter of Steve Arons.)  Other friends write of Gene's involvement in community activities ranging from coaching girls soccer to working on a school committee to provide a safe, alcohol and drug-free graduation party.  (Letter of Alan Cordover.)

### B.     Working Life

Gene Hovanec has always been a loyal and hardworking employee.  For the first seven years after college, Mr. Hovanec worked as an accountant in the New York metropolitan area.  In 1980, a job change took Gene and family to California.  People who worked with him thirty years ago, such as Constance Friedman, remember him as "upbeat, friendly, loyal and honest."  In describing Mr. Hovanec's incredible qualities as a co-worker, Ms. Friedman writes: "I realize this letter sounds like a fairy tale but I will swear on the bible, that this is the Gene Hovanec whom I know."  (Letter of Constance Friedman.)

From 1993 to 2006, Mr. Hovanec worked at Vitesse.  He was the CFO until early 2005 and then worked for the next year as Executive Vice President.  Mr. Hovanec primarily was involved in generalist issues.  He played a relationship role – involved in the company's general relationships with customers, distributors, outside counsel, consultants, bankers, and board members.

During the 1990s, Mr. Hovanec received a salary in the  $100,000+ range, growing over time.  As was common with high tech companies, part of the compensation package for employees at Vitesse involved stock options.  Vitesse grew in the 1990s, its stock price rose, and the bulk of Mr. Hovanec's compensation was from his stock.  In the 2000s, Mr. Hovanec earned in the low $200,000s.  Mr. Hovanec continued to receive stock options, but the stock price had dropped and Mr. Hovanec never earned any money from those options.

The people at Vitesse loved working with Mr. Hovanec.  This became clear at trial even from the government's witnesses.  It is equally clear from deposition testimony and

letters to the Court.  For example, Vitesse did a lot of its business through distributors.

One of its main distributors was a company called Jaco Electronics.  In a letter to the

Court, Jaco's owner Joel Girsky writes that, having done business with Mr. Hovanec for

years, and sometimes negotiating as adversaries,  he would "trust Gene with the keys to

our home."  (Joel Girsky letter.)  During the 2000s, Vitesse's primary distributor was Nu

Horizons.  When deposed in the SEC case, Nu Horizons' President Arthur Nadata spoke

about how Mr. Hovanec was always courteous, reasonable, and a pleasure to have as a

business partner.  (Deposition Testimony of Arthur Nadata dated April 26, 2011 at 104-

5.)  Nu Horizons' David Bowers testified at trial that Mr. Hovanec was fair, pleasant, and

"a man of his word."  (Trial Testimony of David Bowers, Feb 4, 2013 TR at 1435.)

Vitesse's H.R. Director Sabra Bennett captured Mr. Hovanec's demeanor in her

letter to the Court, when she wrote:

> "The employees were very fond of Gene. He had a great sense of humor
> and was very kind. He was interested in what they thought and how they
> were doing.  Gene is a family man and he could always relate to employees
> on that level….Gene is a kind and caring man who always went out of his
> way to recognize the contributions of every member on his team.  ***I was
> always struck by the fact that Gene treated the lowest level employee as if
> they were an executive….He was known throughout the company for his
> simple acts of kindness…buying the dock workers lunch or bagels
> …organizing baby showers…the list goes on and on***….One act of
> kindness that I will personally never forget was when I went to Gene and
> our VP of Human Resources and informed them that one of my employees
> did not have enough money to buy a car…Without a second thought, Gene
> suggested that the three of us chip in together and give the employee a loan
> with our own money and then charge the employee minimal interest so that
> the employee could purchase a used car without feeling as if he was
> accepting a 'handout'.  To make a long story short, none of us ever got our
> personal investment back but the payback came in the form of knowing that
> we had done the right thing for a family in need."

(Letter of Sabra Bennett; emphasis added.)

In her deposition in the SEC proceeding, former Vitesse employee Cozy Darby

was similarly appreciative of  Mr. Hovanec:  "I'm a big Gene fan.  He – the man

singlehandedly empowered me, gave me the ability to move into different roles. I could

have been pigeonholed in planning.  Mr. Hovanec was a – one of the few female

advocates in Vitesse, I felt.  He was very high-spirited, a motivator, lots of interaction with everyone.  He treated the person on the shipping dock as if they were Lou, you know, very social person.  And I felt like he trusted me and gave me bandwidth to go and explore new career opportunities, and I really appreciated that."  (Deposition Testimony of Cozette Darby, October 5, 2011 at 19-20.)

Vitesse's Vice President of Sales, Richard Riker, testified that Mr. Hovanec was congenial, open, and a joy to work with.  (Trial Testimony of Richard Riker, Feb 11, 2013 TR at 2443-44.)

Even the Government's two main witnesses admitted that Mr. Hovanec treated people with respect and warmth.  In his testimony, Yatin Mody described Mr. Hovanec as a nice, decent human – a team player who supported others and worked diligently to help build the business.  (Trial Testimony of Yatin Mody, April 5, 2012 TR at 1821-22; April 11, 2012 TR at 2317-18; January 29, 2013 TR at 856-57 and January 30, 2013 TR at 1021-23).  Nicole Kaplan likewise described Mr. Hovanec as a friendly, easy-going guy with whom she enjoyed working.  Though Ms. Kaplan was cooperating with the Government and suggesting that she was pressured by Mr. Mody and others, she conceded that, in contrast, Mr. Hovanec was always courteous and professional.  (Trial Testimony of Nicole Kaplan, February 7, 2013 TR at 1993.)

One of Vitesse's lenders, Andy Malik of Needham & Company and formerly of Lehman Brothers, describes Mr. Hovanec as "always principled, forthright, honest, fair and understanding, all the while trying to do what was best for his company, the shareholders and the employees."  (Malik letter.)

Mr. Hovanec has now been gone from Vitesse for 7½ years, and the days pass more slowly.  Mr. Hovanec's wife Vicky writes: "It saddens him to not go to work and mingle with the people….I cannot tell you how many times at company picnics or company Christmas parties, his co-workers would come up to me and tell me how much they enjoy working with him."  (Mrs. Hovanec letter.)

After Vitesse, Mr. Hovanec formed a small business that distributes janitorial supplies.  That provided the Hovanecs with a modest income for several years – enough to pay for health insurance for him and his wife.  When the economy crashed in 2008, however, his business slowed down.  He is now down to one customer and earned just $4000 from the business in the first six months of 2013.  He has also worked with his daughter Jackie trying to develop and market a product called *steam-and-out* – a sponge that you put in a dryer to take out wrinkles.  Their business has a patent pending but no income yet.  (Letters of Gene Hovanec and Jacqueline Nekovar.)

## VII.   OTHER SENTENCING CONSIDERATIONS

### A.   Acceptance of Responsibility

Mr. Hovanec has never denied his role in 2006 in re-typing and inputting board minutes into the computer as part of an attempt to address the concerns of the Munger lawyers and deflect the prospect of an SEC investigation.  At each of the two trials, the Government called several witnesses to discuss the April 2012 entering of the minutes into the Company computer.  Mr. Hovanec's counsel did not seek to refute such testimony.  In his closing argument, Mr. Hovanec's counsel never once challenged the evidence relating to this conduct.  Mr. Hovanec knows this conduct was wrong and is ashamed of his role in it.

### B.   Zero Chance of Repeating

#### 1.   Mr. Hovanec's Good Character

Mr. Hovanec is by nature a law-abiding citizen and a good person.  Aside from this case, he has never been investigated, charged, or even sued civilly.  He votes, pays his taxes, and supports his country, community, and family.

#### 2.   He Will Never Again Be an Officer or Director of a Public Company

Mr. Hovanec has not worked for seven years.  As part of his settlement with the SEC, he has agreed to a ten-year bar from being an officer or director of a public

company.  This is effectively a lifetime bar; Mr. Hovanec will never again be an officer of a public company.

### C.    Nature of the Offense Weighs in Favor of Mitigation

Under 18 U.S.C. § 3553(a)(1), the Court should consider the nature of the offense in determining an appropriate sentence.  Here, the offense conduct was of short duration: the Vitesse executives entered the minutes into the Executive Assistant's computer on Wednesday, April 12, 2006.  That weekend, they agreed to tell the Munger attorneys what they had done and Dr. Tomasetta did so on Monday, April 17th.  Their conduct was intended in part to decrease the chance of a contemplated SEC investigation but because the SEC investigation had not yet commenced, no federal investigation was ever obstructed.  In the end, no harm resulted from the short-lived agreement to pre-empt a possible SEC investigation.

Two other facts further mitigate the seriousness of the offense.  First, in late 2005 the executives disclosed to Vitesse's outside counsel at Davis Polk and to its Board that they could not find the minutes and that they were going to create minutes.  Davis Polk attorneys did not object.  Second, Hovanec was neither the CEO nor the CFO at the time.  None of this excuses Mr. Hovanec's obstructive conduct on April 12, 2006, but it mitigates the relative seriousness of the offense.

### D.    Financial Punishment

The Hovanecs have lost some 90% of their wealth since the onset of this investigation in 2007.  To cover legal settlements, costs, and fees, Mr. Hovanec has paid millions of dollars and was forced to sell his residence.  With little money, no job, and liabilities from the litigation, he cannot qualify for a loan.  He has already paid a heavy financial price for his misconduct.

## VIII.  CONCLUSION

The testimony during this prosecution and numerous testimonials filed in support of this sentencing memorandum demonstrate that Gene Hovanec has lived a life marked

mainly by honesty, faith, generosity and empathy.  He exhibited these qualities at home, in the neighborhood, and at work.  Now is when all of the good that he has done in his life should count.  After 7½ years consumed by litigation, public scorn, hardship, and stress, Mr. Hovanec comes before the Court in the rarest of cases where prosecutors in the U.S. Attorney's Office agree that this case warrants straight probation.  That recommendation comes from fair-minded Assistant U.S. Attorneys who, after a lengthy investigation and two jury trials, have a pretty good sense of Mr. Hovanec.  The Probation Officer concurs with this recommendation.  We respectfully ask the Court to follow the parties' recommendation and sentence Mr. Hovanec to probation.

Dated: Los Angeles, CA
November 1, 2013

BIRD, MARELLA, BOXER, WOLPERT,
    NESSIM, DROOKS & LINCENBERG, P.C.

Gary S. Lincenberg
Peter J. Shakow
1875 Century Park East, 23rd Floor
Los Angeles, California  90067
310.201.2100

CLAYMAN & ROSENBERG
Charles Clayman
Isabelle Kirshner
305 Madison Avenue
New York, New York  10165
212.922.1080

By:    */s/ Gary S. Lincenberg*
            Gary S. Lincenberg
            *Attorneys for Defendant*
            *Eugene Hovanec*